UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN EDWARD BARKER,<br><br>                              Plaintiff,<br><br>                    -v.-<br><br>THE BANCORP, INC.,<br><br>                              Defendant. | 21 Civ. 869 (KPF) |
| ALEXANDER JOHN KAMAI,<br><br>                              Plaintiff,<br><br>                    -v.-<br><br>THE BANCORP, INC.,<br><br>                              Defendant. | 21 Civ. 896 (KPF) |
| JOHN PATRICK McGLYNN III,<br><br>                              Plaintiff,<br><br>                    -v.-<br><br>THE BANCORP, INC.,<br><br>                              Defendant. | 21 Civ. 897 (KPF) |

## OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

Plaintiffs John Barker, Alexander Kamai, and John McGlynn commenced three separate actions in New York State Supreme Court against their former employer, Defendant The Bancorp., Inc., seeking unpaid compensation under four theories: (i) breach of contract, (ii) breach of implied contract, (iii) quantum meruit and unjust enrichment, and (iv) promissory estoppel. Defendant removed the three cases to federal court on diversity grounds and now moves to dismiss them all. For the reasons that follow, the Court grants in part and denies in part Defendant's motion.

## BACKGROUND[1]

### A.    Factual Background

Plaintiffs are former employees of the Real Estate Capital Market ("RECM") team of The Bancorp, Inc. ("Bancorp" or "Defendant"), each of whom was terminated from Bancorp in October 2020.  (*See* Barker Compl. ¶¶ 3, 68; Kamai Compl. ¶¶ 3, 52; McGlynn Compl. ¶¶ 3, 62).  Barker, a citizen of Connecticut, and McGlynn, a citizen of Florida, each worked as a Managing Director of Bancorp.  (Barker Compl. ¶¶ 14, 49; McGlynn Compl. ¶¶ 13, 25)).  Kamai, a citizen of New York, worked as a Vice President of the company.

---

[1]    This Opinion draws its facts from each Plaintiff's complaint (*Barker* v. *The Bancorp, Inc.*, No. 21 Civ. 869 (KPF), Dkt. #1-1 ("Barker Complaint" or "Barker Compl."); *Kamai* v. *The Bancorp, Inc.*, No. 21 Civ. 896 (KPF), Dkt. #1-1 ("Kamai Complaint" or "Kamai Compl."); and *McGlynn* v. *The Bancorp, Inc.*, No. 21 Civ. 897 (KPF), Dkt. #1-1 ("McGlynn Complaint" or "McGlynn Compl."), and together, the "Complaints").  Citations to the docket in this Opinion are to the docket in the lead case, *Barker,* unless otherwise specified.

For the purposes of resolving this motion, the Court considers all well-pleaded factual allegations in the Complaints to be true, and draws all reasonable inferences in Plaintiffs' favor.  *See Judd Burstein, P.C.* v. *Long*, 797 F. App'x 585, 587 (2d Cir. 2019) (summary order) (explaining that on a motion to dismiss, a court "must determine whether [a plaintiff's] well-pleaded allegations, accepted as true, state a claim to relief that is plausible on its face" (citing *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009))).  The Court will also consider Defendant's Notices of Removal (Barker Dkt. #1 ("Barker Notice"); Kamai Dkt. #1 ("Kamai Notice"); McGlynn Dkt. #1 ("McGlynn Notice"), and together, the "Removal Notices").  As described in more detail below, the Court draws additional facts from certain exhibits appended to the Declaration of Jennifer Terry in support of Defendant's motion to dismiss (Dkt. #14 ("Terry Decl., Ex. [ ]")), which exhibits are incorporated by reference in, or integral to, the Complaints.  *See Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 558-59 (2d Cir. 2016) (delineating the materials a court may consider on a motion to dismiss, and explaining that a document is integral to a pleading where the pleading "relies heavily upon its terms and effect").  These exhibits include the Plaintiffs' signed offer letters (Terry Decl., Ex. A ("Barker Offer Letter"); *id.,* Ex. F ("Kamai Offer Letter"); *id.,* Ex. K ("McGlynn Offer Letter"); and together, the "Offer Letters")) and the Restricted Stock Unit Award Agreement ("Stock Agreement") signed by each Plaintiff in 2018-2020 (*id.,* Ex. C-E (Barker); H-J (Kamai); M-O (McGlynn)).

For ease of reference, the Court refers to Defendant's combined memorandum of law in support of its motion to dismiss as "Def. Br." (Dkt. #13); Plaintiffs' combined memorandum of law in opposition to Defendant's motion to dismiss as "Pl. Opp." (Dkt. #17); and Defendant's reply memorandum as "Def. Reply" (Dkt. #18).

(Kamai Compl. ¶¶ 13, 25).  Defendant is a Delaware corporation, with its corporate headquarters in Delaware.  (*See* Barker Compl. ¶ 16).

The factual allegations in the three Complaints are similar.  Plaintiffs allege that they were strong performers who were consistently paid annual bonuses in recognition of their achievements during the preceding year.  (*See* Barker Compl. ¶¶ 38, 56; Kamai Compl. ¶¶ 28, 36; McGlynn Compl. ¶¶ 30, 32).  As members of Bancorp's RECM team, all three reported to Ron Wechsler.  (*See* Barker Compl. ¶¶ 31, 33; Kamai Compl. ¶¶ 24, 26; McGlynn Compl. ¶ 25).  Each Plaintiff received a substantial annual bonus for his performance, and each Plaintiff considered his bonus, and not his base salary, to be the primary and most substantial portion of his total annual compensation.  (Barker Compl. ¶ 63; Kamai Compl. ¶¶ 48-49; McGlynn Compl. ¶¶ 48-49).

On March 17, 2020, Damian Kozlowski, Bancorp's Chief Executive Officer, held a company-wide call to address the COVID-19 pandemic and announced that all employees were to work remotely until it was safe to return to the office.  (*See* Barker Compl. ¶ 57).  In addition, he stated, "[W]hen the pandemic ends, all of you will be able to return to your jobs at Bancorp."  (*See id.*).

As it happened, Bancorp had agreed in January 2020 to sell $825,000,000 of its real estate loans to Waterfall Asset Management ("Waterfall").  (*See* Barker Compl. ¶ 58).  Waterfall and Wechsler had wanted to close the sale on March 1, 2020, but Kozlowski insisted on closing the sale on April 1, 2020.  (*See id.*).  As a result of the COVID-19 pandemic, the market

price of the loans changed dramatically between March 1, 2020, and April 1, 2020, and that change prompted Waterfall to exercise its contractual right to terminate the sale in the event of a material change in market pricing.  (*See id.*).  Waterfall subsequently sued Bancorp to recover its $12.6 million deposit. (*See id.*).[2]

On September 14, 2020, Bancorp's RECM team was informed that Bancorp was exiting the real estate securitization business.  (*See* Barker Compl. ¶ 68).  Each Plaintiff was informed that his position was being terminated, but that due to his strong track record and qualifications, he would be recommended for another job within the company.  (Barker Compl. ¶ 69; Kamai Compl. ¶ 53; McGlynn Compl. ¶ 63).  Chief Human Resources Officer Jennifer Terry also explained to each Plaintiff that he would be offered a severance package, in an amount specific to each Plaintiff, that included as well a release of claims against Bancorp; no Plaintiff signed the proposed severance agreement.  (Barker Compl. ¶ 70; Kamai Compl. ¶¶ 57, 60; McGlynn Compl. ¶ 66).[3]

In their Complaints, each Plaintiff alleges that he is entitled to (i) a 2020 bonus, based on the parties' express agreements, their prior course of dealing,

---

[2]    The Waterfall litigation remains ongoing.  (*See* Barker Compl. ¶ 58).

[3]    While Terry told Barker that he would receive a severance package, she did not contemporaneously provide him with a copy of the proposed severance agreement. (Barker Compl. ¶ 70).  Barker did, however, receive a retention agreement, which provided him an opportunity to remain employed by Bancorp through December 11, 2020, and which also contained a general release in Bancorp's favor.  (*Id.* at ¶ 71). Neither Barker nor McGlynn expressly indicates whether he ultimately signed any agreement that released Bancorp from all claims.  Kamai makes clear in his Complaint that he did not sign the severance agreement.  (Kamai Compl. ¶ 60).

certain verbal promises allegedly made by agents of Bancorp, Plaintiffs'
performance and revenues generated, and/or Bancorp's obligations under the
implied covenant of good faith and fair dealing; (ii) shares in Bancorp for prior
years' work and/or bonus compensation, in the form of either a cash
equivalent as of the date of Plaintiffs' termination or continued vesting of the
stock; and (iii) severance pay, based on Bancorp's prior treatment of other
similarly situated former executives and the "pattern and practice" of financial
service institutions similarly situated to Bancorp.  (Barker Compl. ¶¶ 7-10;
Kamai Compl. ¶¶ 7-10; McGlynn Compl. ¶¶ 7-10).  Additionally, Barker alleges
that he is entitled to a commission for loans that he originated in fall 2020 for
Bancorp's Small Business Administration ("SBA") team.  (Barker Compl. ¶ 11).
Because there are minor differences among them, the Court now proceeds to
discuss each Plaintiff's factual claims.

### 1.     John Barker

Barker alleges that when he was hired at Bancorp in 2015, Wechsler
promised him that he would be paid an annual bonus for the previous year's
work and, further, that his bonus would be between 16% to 20% of the revenue
that Barker brought in for Bancorp.  (Barker Compl. ¶¶ 31-32).  Each year
thereafter, Barker received a bonus for his performance, and each year's bonus
increased as a result of his substantial contributions to the firm's revenue.  (*Id.*
at ¶ 37).  In 2016, for example, Barker received a $50,000 cash bonus in
recognition of his performance in 2015.  (*Id.* at ¶ 39).  In 2017, Barker received
a $200,000 bonus for his 2016 performance, but was notified that 50% of this

amount would be payable in Bancorp stock, which would vest over a three-year period. (*Id.* at ¶ 40). Barker objected that this percentage was too high and the vesting period was too long, and that his stock could be in jeopardy if he were to be laid off through no fault of his own. (*Id.* at ¶¶ 41-42 (citing Stock Agreement, Section 9)). Wechsler advised Barker to contact Paul Frenkiel, Bancorp's Chief Financial Officer, to discuss his concerns. (*Id.* at ¶¶ 42-43). Frenkiel made clear that the terms of the Stock Agreement were nonnegotiable, and he would not directly answer Barker's question as to whether it was Bancorp's intention not to pay him any unvested stock if he were laid off in the future. (*Id.* at ¶ 43). According to Barker, Wechsler confidently assured him, "You are absolutely going to get your stock if we're ever laid off. You and I are in the same boat, so I'll make sure that you also get your stock, too, since I'm going to get mine." (*Id.* at ¶¶ 45-46).[4]

Between 2017 and 2020, Barker continued to perform well, receiving "extremely positive" performance reviews. (Barker Compl. ¶¶ 47-49, 53-56). In January 2020, Barker received a $2,000,000 bonus for his 2019 performance, and Wechsler told him, "[Y]ou are on a roll that I have never seen in my career. You may be paid even more for your 2020 bonus." (*Id.* at ¶¶ 63, 67).

---

[4]     Barker alleges that Wechsler ultimately received all of his stock upon termination of his employment at Bancorp, while Barker did not. (Barker Compl. ¶ 46). However, Wechsler retired from his position (*see id.* at ¶ 72 ("Wechsler … explained to Barker that … he was being forced to retire only five days after turning 65.")), which triggered a different provision of the Stock Agreement. In relevant part, Section 9 of the Equity Incentive Plan provided that Restricted Stock Unit Awards would become "fully vested … on the one year anniversary of the Participant's Termination of Service by reason of the Participant's Retirement." (Stock Agreement 2).

When Barker was informed that his position was being eliminated, he attempted to secure a different role within one of Bancorp's other divisions, even going so far as to provide the company's SBA team with new business leads, but ultimately did not find another role at Bancorp.  (Barker Compl. ¶¶ 76-87).  Despite the fact that Barker was directly responsible for over $316,000,000 in new loan production in 2020, and for approximately $30,000,000 of the company's revenue that year, Bancorp's Chief Investment Officer Mark Connolly informed Barker that Bancorp would not pay any bonuses for a business that Bancorp was exiting.  (*Id.* at ¶ 90).  Connolly suggested, however, that Barker should receive a commission for the business he had directed to the SBA team, to which Barker responded that a commission of $13,250 would be fair.  (*Id.* at ¶ 91).

Barker alleges that he is owed at least $4,135,142.80 in unpaid compensation, including (i) a 2020 bonus in the amount of $2,000,000; (ii) $1,806,892.80 (or alternatively, continued vesting of Barker's 188,218 shares of Bancorp stock), which is the value of Barker's unvested stock as of the date of his termination; (iii) $315,000 in severance pay; and (iv) $13,250 in commission for the SBA loan he originated.  (Barker Compl. ¶ 99).

### 2.    Alexander Kamai

Kamai joined Bancorp on January 22, 2015, as an Analyst reporting to Wechsler.  (Kamai Compl. ¶ 24).  He consistently received positive performance reviews, and he was promoted to Associate in April 2016 and to Vice President in October 2018.  (*Id.* at ¶¶ 25, 28).  On numerous occasions, Wechsler

mentioned to Kamai how well he was doing and how meaningful his contributions were to the RECM team and to Bancorp as a whole. (*Id.* at ¶ 29). Kamai underwrote and closed more commercial mortgage transactions than any other underwriter for Bancorp from 2017 through 2020. (*Id.* at ¶ 30).

Kamai alleges that he is entitled to (i) a 2020 bonus in the amount of $300,000; (ii) 44,905 shares in Bancorp for prior years' work and compensation of $431,088, which represents the share price of $9.60 as of the date of his termination, or, alternatively, continued vesting of the stock; and (iii) $170,000 in severance pay. (Kamai Compl. ¶¶ 7-10).

### 3.   John McGlynn

McGlynn joined Bancorp in June 2012 as a Managing Director of Loan Originations, reporting to Wechsler. (McGlynn Compl. ¶ 25). McGlynn alleges that upon his hire, Wechsler promised him that he would be paid an annual bonus for the previous year's work. (*Id.* at ¶ 26). In 2017, McGlynn received a $350,000 bonus for his 2016 performance, but was notified that 50% of this amount would be payable in Bancorp stock, which would vest over a three-year period. (*Id.* at ¶¶ 48, 50). McGlynn, like Barker, objected that this percentage was too high and was inconsistent with customary stock plans on Wall Street. (*Id.* at ¶ 51). As he had done with Barker, Wechsler assured McGlynn that Wechsler was subject to the same provisions of the Agreement, and that they should not worry about not collecting any unvested stock if they were laid off or the group shut down. (*Id.* at ¶¶ 55-57).

When McGlynn was informed that his position was being eliminated, he attempted, but ultimately failed, to secure a different role within one of Bancorp's other divisions.  (McGlynn Compl. ¶¶ 80, 85).  Despite the fact that McGlynn was directly responsible for generating $17,000,000 of the company's revenue that year, Connolly informed McGlynn that Bancorp would not pay any bonuses for a business that Bancorp was exiting.  (*Id.* at ¶ 88).

McGlynn alleges that he is entitled to (i) a 2020 bonus in the amount of $1,300,000; (ii) $1,294,627.20, which represents 134,857 shares in Bancorp at the share price of $9.60 as of the date of his termination, or, alternatively, continued vesting of the stock; and (iii) $315,000 in severance pay.  (McGlynn Compl. ¶ 11).

## B.   Procedural Background

Plaintiffs commenced each of these related actions on January 12, 2021, by filing a summons and complaint against Defendant in the Supreme Court of the State of New York, County of New York, asserting claims for (i) breach of contract, (ii) breach of implied contract, (iii) unjust enrichment, and (iv) promissory estoppel.  (*See* Removal Notices ¶ 1; *see generally* Complaints).[5]

---

[5]   Plaintiffs' Complaints refer to both quantum meruit and unjust enrichment, but for the sake of clarity, the Court will refer only to "unjust enrichment."  Under New York law, quantum meruit and unjust enrichment are analyzed together as a single quasi-contract claim.  *See generally Int'l Techs. Mktg., Inc.* v. *Verint Sys., Ltd.*, 157 F. Supp. 3d 352, 370 (S.D.N.Y. 2016) (citing *Mid-Hudson Catskill Rural Migrant Ministry, Inc.* v. *Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005)), *aff'd*, 850 F. App'x 38 (2d Cir. 2021) (summary order).  "[Q]uantum meruit and unjust enrichment are not separate causes of action; rather, unjust enrichment is a required element for an implied-in-law, or quasi contract, and quantum meruit, meaning 'as much as he deserves,' is one measure of liability for the breach of such a contract."  *Id.* (citation omitted).

On February 1, 2021, Defendant removed the *Barker* action to the United States District Court for the Southern District of New York.  (*See* Barker Notice).  The following day, Defendant did the same with respect to the *Kamai* and *McGlynn* actions, and those actions were referred to this Court as related to the *Barker* action.  (*See* Kamai Dkt. #1, 3; McGlynn Dkt. #1, 3).

On February 26, 2021, Defendant requested leave to file a motion to dismiss each of the three cases.  (Dkt. #7).  The Court held a pre-motion conference on April 8, 2021, during which it directed Plaintiffs to file amended complaints by May 7, 2021, and set a briefing schedule for Defendant's contemplated motion to dismiss.  (*See* Minute Entry for April 8, 2021). Plaintiffs elected not to file amended complaints.  Defendant filed its motion to dismiss the three complaints on June 11, 2021.  (Dkt. #12-14).  Plaintiffs filed their combined opposition brief on July 23, 2021.  (Dkt. #17).  Defendant filed its reply on August 9, 2021.  (Dkt. #18).  Accordingly, Defendant's motion is fully briefed and ripe for decision.

## DISCUSSION

### A.   Applicable Law

#### 1.   Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court should "draw all reasonable inferences in Plaintiffs' favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief."  *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks and citation

omitted).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).  While the plausibility requirement "is not akin to a 'probability requirement' ... it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  Toward that end, a plaintiff must provide more than "an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.*  Moreover, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Id.* at 678 (quoting *Twombly*, 550 U.S. at 557).

### 2.  Documents That May Be Considered in Resolving Rule 12(b)(6) Motions

A court adjudicating a motion to dismiss under Rule 12(b)(6) "may review only a narrow universe of materials."  *Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).  This narrow universe includes "facts stated on the face of the complaint, ... documents appended to the complaint or incorporated in the complaint by reference, and ... matters of which judicial notice may be taken," as well as documents that can properly be considered "integral" to the complaint.  *Id.* (internal citation omitted).  A document is integral to the complaint "where the complaint relies heavily upon its terms and effect."  *Id.* (quoting *Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)).

Defendant has submitted additional documents for the Court's consideration that it claims are either incorporated by reference in the

Complaints or integral to Plaintiffs' claims, but which Plaintiffs deliberately chose not to attach to their Complaints.  (Def. Br. 7).  In particular, Defendant urges the Court to consider (i) Plaintiffs' signed Offer Letters, which, according to Defendant, provide that Defendant reserved complete discretion over any bonus payment eligibility; (ii) Bancorp's employee handbook (Terry Decl., Ex. P (the "Employee Handbook" or "Handbook")), which Defendant concedes is not a contract, but is a document that set forth the policy regarding incentive compensation of which Plaintiffs were aware; and (iii) the Stock Agreements between Defendant and each Plaintiff, which agreements are specifically referenced in the Barker and McGlynn Complaints and incorporated by reference in the Kamai Complaint.  (Def. Br. 1-2, 6-9; *see also* Barker Compl. ¶¶ 42-43; McGlynn Compl. ¶ 52).[6]

The Second Circuit has cautioned district judges to be mindful of litigants who cherry-pick among relevant documents, and has clarified that district courts may consider relevant documents that are fairly implicated by a plaintiff's claims, irrespective of whether they are part of the pleadings.  *See, e.g., L-7 Designs, Inc.* v. *Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (concluding that a plaintiff's "failure to include matters of which as pleaders they had notice and which were integral to their claim — and that they apparently most wanted to avoid — may not serve as a means of forestalling the district court's decision on a [Rule] 12(b)(6) motion" (internal quotations,

---

[6]     Kamai does not specifically reference the Stock Agreement, but it is integral to his claim that he is entitled to an award of Bancorp stock.

alterations, and citation omitted)); *Glob. Network Commc'ns, Inc.* v. *City of New York*, 458 F.3d 150, 156-57 (2d Cir. 2006) ("In most instances where this exception [permitting district courts to consider extrinsic materials] is recognized, the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason — usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim — was not attached to the complaint." (collecting cases)); *Cortec Indus., Inc.* v. *Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991) (concluding that district court could have considered certain documents that "plaintiffs had either in its possession or had knowledge of and upon which they relied in bringing suit.  It did not lack notice of those documents; these papers were integral to its complaint.").

When the Court asked Plaintiffs' counsel about the Offer Letters at the pre-motion conference, counsel conceded that they "certainly should be considered" on this motion.  (Dkt. #10 (Transcript of April 8, 2021 Conference) at 19:3-9).  Further, Plaintiffs "do not contend that the Court cannot consider any documents that have been incorporated by reference in the Complaints or are otherwise integral to the claims advanced" (Pl. Opp. 12), which the Court concludes must include the Offer Letters, as well as the Stock Agreement. However, Plaintiffs dispute that the Employee Handbook can be considered on this motion.  (*Id.*).

The Employee Handbook specifically recites that (i) it "is not intended to and does not create an express or implied contract of employment or any other

13

contractual rights, obligations, or liabilities ... and the Company is not contractually or otherwise legally bound by it" (Employee Handbook 3); (ii) "[n]o representative of the Company (unless approved by the Company's CEO or President, in writing) has the authority ... to make any promises with respect to compensation" (*id.* at 2); and (iii) "[i]ncentive compensation is solely at the discretion of the Company and may be changed or eliminated at any time" (*id.* at 46). Defendant, for obvious reasons, urges the Court to consider the Handbook on this motion. However, the Handbook is not "incorporated by reference" in Plaintiffs' Complaints, and by its own terms, is not "a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls." *See Goel*, 820 F.3d at 559. The Court therefore may not consider it on this motion. *See Sollazzo* v. *Rest.*, No. 15 Civ. 0252 (ER), 2016 WL 1071031, at *3 (S.D.N.Y. Mar. 17, 2016) (refusing to consider materials attached to defendant's motion to dismiss, including employee handbook, because "[plaintiff's] Complaint makes no reference to them and they are not the kind courts usually take judicial notice of"); *cf. Roe* v. *St. John's Univ.*, No. 19 Civ. 4694 (PKC) (RER), 2021 WL 1224895, at *14 (E.D.N.Y. Mar. 31, 2021) (considering university's student handbook that was referenced in a policy appended to plaintiff's complaint); *Marcus* v. *Leviton Mfg. Co.*, No. 15 Civ. 656 (SJF) (GRB), 2016 WL 74415, at *1 n.1 (E.D.N.Y. Jan. 6, 2016) (taking judicial notice of defendant's employee handbook that was referenced in the amended complaint), *aff'd*, 661 F. App'x 29 (2d Cir. 2016) (summary order). Accordingly, the Court will consider Plaintiffs' signed Offer Letters and the

Stock Agreement, but not the Employee Handbook, in resolving the instant motion.

## B. Plaintiffs Fail to State a Claim for Breach of Contract

The Court first considers Plaintiffs' claims of breach of an express agreement between them and Bancorp. "To state a claim in federal court for breach of contract under New York law, a complaint need only allege [i] the existence of an agreement, [ii] adequate performance of the contract by the plaintiff, [iii] breach of contract by the defendant, and [iv] damages." *Harsco Corp.* v. *Segui*, 91 F.3d 337, 348 (2d Cir. 1996); *accord Frye* v. *Lagerstrom*, No. 20-3134, 2021 WL 4022695, at *4 (2d Cir. Sept. 3, 2021) (summary order).[7]

Of potential significance to the instant motion, "[a] complaint 'fails to sufficiently plead the existence of a contract' if it does not provide 'factual allegations regarding, *inter alia*, the formation of the contract, the date it took place, and the contract's major terms.' Conclusory allegations that a contract existed or that it was breached do not suffice." *Ebomwonyi* v. *Sea Shipping Line*, 473 F. Supp. 3d 338, 347 (S.D.N.Y. 2020) (internal citations omitted), *aff'd*, No. 20-3344, 2022 WL 274507 (2d Cir. Jan. 31, 2022) (summary order); *see also Childers* v. *N.Y. & Presbyterian Hosp.*, 36 F. Supp. 3d 292, 312

---

[7]    The parties do not dispute that New York law applies in this case. The parties' "implied consent ... is sufficient to establish choice of law." *Krumme* v. *Westpoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000); *see also Valentini* v. *Grp. Health Inc.*, No. 20 Civ. 9526 (JPC), 2021 WL 2444649, at *6 (S.D.N.Y. June 15, 2021) ("The parties do not dispute that New York law applies in this case, and the Court accordingly applies that law."). Accordingly, the Court applies New York law to each of Plaintiffs' claims.

(S.D.N.Y. 2014) (dismissing a contract claim where the complaint alleged, "in a conclusory fashion, that there was an express contractual relationship between the parties, but it d[id] not include any details regarding this alleged express contract" (internal quotation marks omitted)); *Eaves* v. *Designs for Fin., Inc.*, 785 F. Supp. 2d 229, 254 (S.D.N.Y. 2011) (holding that plaintiffs' failure to "provide facts regarding any specific contract between the parties, how or when such contract was formed, or any terms of the contract(s) at issue" was "fatal" to their contract claims).

### 1.    Discretionary Bonuses

To begin, Plaintiffs have failed to plead a breach-of-contract claim with respect to the unpaid discretionary bonuses they seek for 2020.  "In general, entitlement to a bonus exists only when the terms of the relevant contract require it."  *Iqbal* v. *Teva Pharms. USA, Inc.*, No. 16 Civ. 3464 (VB), 2017 WL 6729190, at *5 (S.D.N.Y. Dec. 28, 2017), *aff'd,* 753 F. App'x 50 (2d Cir. 2018) (summary order).  "However, this rule is limited by the 'long standing policy against the forfeiture of earned wages.'"  *Id.* (citations omitted).  "Consistent with this rule (and its limitation), when an employee has already earned compensation under the terms of his employment contract, his termination does not affect his rights to that compensation."  *Id.*  "However, when the employer retains discretion to award a bonus (or other compensation), no forfeiture of earned wages occurs if a bonus is not paid."  *Id.*

In other words, "[u]nder New York law, an employee cannot recover for an employer's failure to pay a bonus where the employer has absolute

discretion over the bonus decision." *Longhi* v. *Lombard Risk Sys., Inc.*, No. 18 Civ. 8077 (VSB), 2019 WL 4805735, at *5 (S.D.N.Y. Sept. 30, 2019); *see also Bessemer Tr. Co., N.A.* v. *Branin*, 618 F.3d 76, 92 (2d Cir. 2010) (affirming dismissal of claim under New York law for increased bonus where bonus provision "reserve[d] to the Salary Committee the decision to award or not to award a bonus, and in what amount"); *Namad* v. *Salomon Inc.*, 74 N.Y.2d 751, 752-53 (1989) (affirming dismissal of claim for bonus where "the bonus clause unambiguously vests discretion regarding the amount of bonus compensation to be awarded in defendants' management"). That said, "[t]he employer's absolute discretion must be stated unambiguously in the contractual documents to justify dismissal of a bonus claim." *Longhi*, 2019 WL 4805735, at *5; *see also Fishoff* v. *Coty Inc.*, 634 F.3d 647, 653-54 (2d Cir. 2011) ("Discretion to modify or cancel an incentive … will not be implied if there exists no explicit contractual provision assigning the employer absolute discretion to pay such compensation." (citation omitted)); *Ashmore* v. *CGI Grp. Inc.*, No. 11 Civ. 8611 (LBS), 2012 WL 2148899, at *8-9 (S.D.N.Y. June 12, 2012) (declining to dismiss bonus claim where employer retained considerable discretion to determine whether to pay bonuses, but contract did not unambiguously indicate that employer had "absolute discretion"). "In the absence of an unambiguous statement of absolute discretion, whether unpaid compensation constituted a discretionary bonus or nonforfeitable earned wages is a question of fact." *Longhi*, 2019 WL 4805735, at *5 (citing *Doolittle* v. *Nixon*

*Peabody LLP*, 6 N.Y.S.3d 864, 866 (4th Dep't 2015); *Kaplan* v. *Capital Co. of Am. LLC*, 747 N.Y.S.2d 504, 505 (1st Dep't 2002)).

Here, Bancorp retained absolute discretion to award bonuses, so the nonpayment of a bonus to Plaintiffs for their 2020 performance cannot be construed to constitute a forfeiture of earned wages.  Each Plaintiff's Offer Letter provided, in nearly identical phrasing, "[You will be] [e]ligible for [a] discretionary Bonus at the discretion and approval of the Company."  (*See* Barker Offer Letter; Kamai Offer Letter; McGlynn Offer Letter).  This language — in particular, the use of the words "discretionary," "discretion" and "eligible" (as opposed to "entitled") — is similar to the clear language found by other courts to convey unambiguous, absolute discretion over bonuses.  *See, e.g., Hunter* v. *Deutsche Bank AG, N.Y. Branch*, 866 N.Y.S.2d 670 (1st Dep't 2008) *aff'g Hunter* v. *Deutsche Bank AG*, 2007 NY Slip Op. 33668(U), 10, 2007 WL 4113676 (N.Y. Sup. Ct. 2007) (concluding that employer had absolute discretion where handbook provided that although all employees were "eligible to receive a discretionary cash bonus," "[d]ecisions on [t]otal [c]ompensation are at the complete discretion of the [employer,]" and some employees might receive no bonus); *Apple Mortg. Corp.* v. *Barenblatt*, 162 F. Supp. 3d 270, 291 (S.D.N.Y. 2016) (concluding that employer had absolute discretion where employees (i) became "eligible" for bonuses if they fulfilled certain conditions and (ii) acknowledged in depositions that that their employment contracts did not impose a duty to pay bonuses); *Cohen* v. *Avanade, Inc.*, 874 F. Supp. 2d 315, 321 (S.D.N.Y. 2012) (concluding that employer had absolute discretion

18

where a compensation plan stated that employer could "interpret and apply the [compensation plan] as it deem[ed] appropriate" and "reserve[d] the right to modify, suspend or terminate" the sales compensation plan "at its sole and absolute discretion"); *Welland* v. *Citigroup, Inc.*, No. 00 Civ. 738 (NRB), 2003 WL 22973574, at *15 (S.D.N.Y. Dec. 17, 2003) (concluding that employer had absolute discretion where bonuses were not "automatically awarded year to year and [were] determined at management's sole and exclusive discretion"), *aff'd*, 116 F. App'x 321 (2d Cir. 2004) (summary order); *cf. Bravia Capital Partners, Inc.* v. *Fike*, No. 09 Civ. 6375 (JFK), 2011 WL 6081345, at *4 (S.D.N.Y. Dec. 6, 2011) (finding that the words "will be entitled to a bonus" did not vest employer with complete discretion); *O'Shea* v. *Bidcom, Inc.*, No. 01 Civ. 3855 (WHP), 2002 WL 1610942, at *4 (S.D.N.Y. July 22, 2002) (finding that the phrase, "Incentive Compensation … is earned upon a Plan Participant's attainment of goals prescribed in his/her Plan," suggested a contractual obligation to pay the referenced compensation).

Plaintiffs note that Barker's and Kamai's Offer Letters contain the language, "Eligible for discretionary bonus at the discretion and approval of The Bancorp for calendar year 2015, payable in early 2016."  (Pl. Opp. 13; Terry Decl., Ex. A, F).  Plaintiffs argue that these Offer Letters are therefore "silent and ambiguous" as to annual bonuses in years after 2015, and that parol evidence (namely, oral promises allegedly made by Defendant) should therefore be considered in order to understand the parties' intentions as to annual bonuses after 2015.  (Pl. Opp. 13, 16).

19

It is a fundamental principle of contract law that agreements are interpreted in accordance with the parties' intent, and the best evidence of the parties' intent is what they expressed in their written contract. *Benihana of Tokyo, LLC* v. *Angelo, Gordon & Co., L.P.*, 259 F. Supp. 3d 16, 33 (S.D.N.Y. 2017), *aff'd*, 712 F. App'x 85 (2d Cir. 2018) (summary order). A written contract that is unambiguous on its face is enforced according to the plain meaning of its terms. *Id.* at n.9. Parol evidence — evidence outside a contract's four corners — is not admissible unless the court determines that the contract is facially ambiguous. *Id.* (citing *Schron* v. *Troutman Sanders LLP*, 20 N.Y.3d 430 (2013)). A contract is unambiguous if on its face it is "reasonably susceptible of only one meaning[.]" *Selective Ins. Co. of Am.* v. *Cnty. of Rensselaer*, 26 N.Y.3d 649, 655 (2016) (quotation omitted). Whether a contract is ambiguous "is an issue of law for the courts to decide." *Innophos, Inc.* v. *Rhodia, S.A.*, 10 N.Y.3d 25, 29 (2008) (quotation omitted).

Here, the Offer Letters' silence regarding the employees' bonus eligibility for years subsequent to 2015 does not render them facially ambiguous. That is because under New York law, "silence does not equate to contractual ambiguity." *Feder Kaszovitz LLP* v. *Rosen*, No. 17 Civ. 2954 (CM), 2018 WL 3708662, at *7 (S.D.N.Y. Aug. 3, 2018) (citing *Greenfield* v. *Philles Recs., Inc.*, 98 N.Y.2d 562, 573 (2002)); *see also Spinelli* v. *Nat'l Football League*, 96 F. Supp. 3d 81, 126 (S.D.N.Y. 2015) ("Silence, or omission of a term, … does not generally create ambiguity.").

Furthermore, courts have been clear that where "the bonus component of compensation dwarfs [a] plaintiff's stated base salary component, the parties would be expected to make reference to such a large sum of money in the written agreement with particularity," as opposed to verbally. *Kamdem-Ouaffo* v. *Balchem Corp.*, No. 17 Civ. 2810 (KMK), 2018 WL 4386092, at *14 (S.D.N.Y. Sept. 14, 2018) (quoting *Johnson* v. *Stanfield Cap. Partners, LLC*, 891 N.Y.S.2d 383, 384 (1st Dep't 2009)).  Here, Barker alleges that in 2019, he earned an annual salary of $315,000 and a bonus of $2,000,000 (Barker Compl. ¶ 63); Kamai alleges that in 2019, he earned an annual salary of $150,000 and a bonus of $414,510 (Kamai Compl. ¶ 48); and McGlynn alleges that in 2019, he earned an annual salary of $315,000 and a bonus of $1,300,000 (McGlynn Compl. ¶ 48).  Each Plaintiff alleges that he "considered his bonus, and not his base salary, to be the primary and most substantial portion of his total annual compensation."  (Barker Compl. ¶ 63; Kamai Compl. ¶ 48; McGlynn Compl. ¶ 48).  Precisely because of these allegations, the Court will not construe the alleged oral promises to vary the terms of the Offer Letters.  *See Kamdem-Ouaffo*, 2018 WL 4386092, at *14 (finding that exclusion of bonus provision from written agreement seemed "implausible," given that plaintiff earned salary of $75,000 per year and bonus of 25% of "several billions"); *Johnson*, 891 N.Y.S.2d at 384 (rejecting plaintiff's attempt to vary terms of written employment agreement via allegation that defendant breached oral promise to create bonus pool equal to 15% of hedge fund revenues to pay bonuses to plaintiff and others in his department).  As such, the Court grants Defendant's

motion to dismiss Plaintiffs' contractual claims for unpaid bonus
compensation.

### 2.    Restricted Stock Units

Plaintiffs have also failed to plead a breach-of-contract claim with respect
to the stock to which they claim entitlement under the Stock Agreement.
Barker and McGlynn allege that in 2017, upon receipt of a bonus for their
performance in 2016, they received notice that half of their bonus would be
payable in Bancorp stock with a three-year vesting period.  (*See* Barker Compl.
¶ 40; McGlynn Compl. ¶ 51).[8]  Though Barker and McGlynn objected to the
percentage and the vesting timeline, Bancorp's Chief Financial Officer, Paul
Frenkiel, expressly told Barker that "under no circumstances could the
Agreement be changed."  (Barker Compl. ¶ 43).

Section 9(v) of the Stock Agreement provides that "[i]f the Participant's
Service terminates for any reason other than due to death, Disability,
Retirement, Involuntary Termination following a Change in Control or for
Cause, all shares of Restricted Stock Units awarded to the Participant which
have not vested as of the date of Termination of Service will expire and be
forfeited."  (Terry Decl., Ex. C-E (Barker's agreements), H-J (Kamai's
agreements), M-O (McGlynn's agreements)).[9]  The Barker Complaint even

---

[8]    Kamai's complaint does not specifically allege that he received the Stock Agreement
described in the Barker and McGlynn Complaints.  Still, Kamai alleges that he is
entitled to an award of stock, which entitlement he ascribes to his signed Stock
Agreements for 2018, 2019, and 2020.  (*See* Terry Decl., Ex. H-J).

[9]    While the Barker and McGlynn Complaints indicate that Plaintiffs first signed the Stock
Agreement in 2017, only the 2018, 2019, and 2020 Agreements signed by each Plaintiff
were provided to the Court.

references this provision, noting that the Stock Agreement "indicated that Barker's stock could be in jeopardy if Barker was laid off through no fault of his own." (Barker Compl. ¶ 42).

Barker and McGlynn now urge the Court to consider Wechsler's oral assurances that they should not be worried about collecting any unvested stock if they were laid off or if the group were dissolved. (Barker Compl. ¶ 44; McGlynn Compl. ¶ 55). But these assurances are irrelevant in light of Section 10.2 of the Agreement, which provides that "[t]his Agreement may not be amended or otherwise modified unless evidenced in writing and signed by the Company and the Participant." (*See* Terry Decl., Ex. C-E, H-J, M-O). Put simply, the Stock Agreement provides that except for certain enumerated exceptions, any unvested stock would be forfeited upon an employee's termination. That is precisely what happened here.

Accordingly, Plaintiffs have not alleged that Defendant breached the Stock Agreement by withholding from them the stock units that remained unvested at the time of their termination. The Court therefore grants Defendant's motion to dismiss Plaintiffs' claims for breach of the Stock Agreement.

### 3. Severance Pay

Plaintiffs have additionally failed to allege the existence of an agreement with Bancorp regarding severance pay, much less any breach of such an agreement. Kamai and McGlynn allege that they each received (but did not sign) a severance agreement, because the agreement required them to execute

23

a release of claims against Bancorp.  (Kamai Compl. ¶ 57; McGlynn Compl. ¶ 66).  Barker alleges that he was told "he would later be receiving a severance package" (Barker Compl. ¶ 70), but makes no further mention of a severance agreement in his Complaint.  Because Plaintiffs have not pleaded a contractual entitlement to severance, the Court finds that Plaintiffs have not alleged a breach of contract with respect to severance, and grants Defendant's motion to dismiss these claims.

### 4. Barker's Commission

As a final claim of breach of contract, Barker alone claims that he is entitled to commission compensation for the SBA loans he originated. However, Barker does not allege that he had an express agreement with Bancorp regarding a commission for the business he brought in for the SBA team prior to his departure.  Instead, Barker claims an entitlement rooted in (i) Connolly's statement that Barker "should be paid a commission"; (ii) Barker's response that "25 basis points of the total loan amount would be fair"; (iii) Connolly's assurance that he would have SBA Executive Vice President Jeff Nager follow up with Barker to resolve the issue; and (iv) Nager's subsequent failure to contact Barker.  (Barker Compl. ¶¶ 91-92).  The Court finds these allegations insufficient to give rise to a contractual entitlement to a commission.

"Under New York law, parties are free to enter into a binding contract without memorializing their agreement in a fully executed document." *Winston* v. *Mediafare Ent. Corp.*, 777 F.2d 78, 80 (2d Cir. 1985).  "In any given case it is

24

the intent of the parties that will determine the time of contract formation." *Id.*
"To determine if parties intend to be bound by an oral contract, '[t]he court is to
consider [i] whether there has been an express reservation of the right not to be
bound in the absence of a writing; [ii] whether there has been partial
performance of the contract; [iii] whether all of the terms of the alleged contract
have been agreed upon; and [iv] whether the agreement at issue is the type of
contract that is usually committed to writing.'" *Acun* v. *Merrill Lynch Pierce
Fenner & Smith, Inc.*, 852 F. App'x 552, 554 (2d Cir. 2021) (summary order)
(quoting *Winston*, 777 F.2d at 80). "No single factor is decisive, but each
provides significant guidance." *Id.* (quoting *Ciaramella* v. *Reader's Digest
Ass'n, Inc.*, 131 F.3d 320, 323 (2d Cir. 1997)). As set forth below, application
of the *Winston* factors does not support the parties' intent to be bound by an
oral contract in the circumstances presented in the Barker Complaint.

The first *Winston* factor, express reservation of the right not to be bound
in the absence of a writing, weighs in favor of enforcing the Oral Agreement.
The Complaint contains no indication that the parties intended this promise to
be conditional on the execution of a written instrument.

The second *Winston* factor, "partial performance," arguably, but weakly,
weighs in favor of finding a binding agreement. "Partial performance favors
enforcement when 'one party has partially performed, and that performance
has been accepted by the party disclaiming the existence of an agreement.'"
*Acun*, 852 F. App'x at 554 (quoting *Ciaramella*, 131 F.3d at 325). The Barker
Complaint clearly alleges partial performance of the contract, but such

performance was undertaken *before* the alleged agreement was reached: Barker alleges that he originated business for the SBA team, and that Connolly thereafter stated that he should receive a commission for having done so.

The third *Winston* factor, "whether all of the terms of the alleged contract have been agreed upon," weighs strongly against enforcement of the Oral Agreement. The Second Circuit has articulated the relevant inquiry on this factor as "whether there was literally nothing left to negotiate." *Attestor Value Master Fund* v. *Republic of Argentina*, 940 F.3d 825, 831 (2d Cir. 2019) (per curiam) (quoting *Winston*, 777 F.2d at 82) (internal quotations omitted). Notably, the Barker Complaint indicates that certain essential terms were missing from the putative oral agreement. "[U]nder New York law, a term is essential if it seriously affects the rights and obligations of the parties." *Morelli* v. *Alters*, No. 19 Civ. 10707 (GHW), 2020 WL 1285513, at *9 (S.D.N.Y. Mar. 18, 2020) (internal quotation marks omitted). Here, Barker has failed to allege the essential terms of the commission agreement, including the amount of the commission and the time for payment. In fact, Connolly expressly deferred to Nager to follow up with Barker to resolve the issue, which demonstrates that there was clearly something left to negotiate.

The fourth and final *Winston* factor, "whether the agreement at issue is the type of contract that is usually committed to writing," is often considered in terms of "whether in the relevant business community, it is customary to accord binding force to the type of informal or preliminary agreement at issue." *Tchrs. Ins. & Annuity Ass'n of Am.* v. *Trib. Co.*, 670 F. Supp. 491, 503 (S.D.N.Y.

1987).  The Court declines to analyze the fourth factor at this stage because "[c]ourts in this district have recognized that 'it is nearly impossible to determine at the motion to dismiss stage whether a more formal contract would normally be expected under prevailing industry conditions.'" *Bloomfield Inv. Res. Corp.* v. *Daniloff*, No. 17 Civ. 4181 (VM), 2021 WL 1611951, at *6 (S.D.N.Y. Apr. 26, 2021), *reconsideration denied*, 2021 WL 2310446 (S.D.N.Y. June 7, 2021) (quoting *Sawabeh Info. Servs. Co.* v. *Brody*, 832 F. Supp. 2d 280, 307-08 (S.D.N.Y. 2011)); *see also FCOF UB Sec. LLC* v. *MorEquity, Inc.*, 663 F. Supp. 2d 224, 231 (S.D.N.Y. 2009) ("[W]hether it is customary to accord binding force to a certain type of preliminary agreement is a question of fact[.]").

In sum, the two *Winston* factors that weigh in Barker's favor — the lack of an express reservation to be bound and the parties' partial performance of the agreement — do not persuade the Court that the parties intended to be bound by an oral agreement.  The parties had not agreed on the essential terms of the agreement, and negotiations had not been completed.  Barker's claim fails.

For all of these reasons, the Court dismisses Plaintiffs' four breach-of-contract claims in their entirety.

## C.    Plaintiffs Have Stated Certain Claims for Quasi-Contractual Relief

In addition to their breach of contract claims, Plaintiffs seek relief under various quasi-contractual theories of recovery.  On this point, the law is clear that "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for

events arising out of the same subject matter." *Beth Israel Med. Ctr.* v. *Horizon Blue Cross & Blue Shield of New Jersey, Inc.*, 448 F.3d 573, 587 (2d Cir. 2006) (citing *Clark-Fitzpatrick, Inc.* v. *Long Island R.R. Co.*, 70 N.Y.2d 382, 388 (1987)). "A 'quasi contract' only applies in the absence of an express agreement, and is not really a contract at all, but rather a legal obligation imposed in order to prevent a party's unjust enrichment." *Id.* "Briefly stated, a quasi-contractual obligation is one imposed by law where there has been no agreement or expression of assent, by word or act, on the part of either party involved." *Id.* Only where "a bona fide dispute exists as to the existence of the contract, the plaintiff may proceed on both breach of contract and quasi-contract theories." *Id.* (citing *Nakamura* v. *Fujii*, 677 N.Y.S.2d 113, 116 (1st Dep't 1998)).

As noted, the Complaints assert claims for (i) breach of implied contract, (ii) unjust enrichment, and (iii) promissory estoppel. The Court will address each of these theories in turn. At the outset, however, the Court dismisses Plaintiffs' quasi-contractual claims regarding the vesting of their restricted stock units. A written contract — the Stock Agreement — governs this subject matter and specifies that "[t]his Agreement may not be amended or otherwise modified unless evidenced in writing and signed by the Company and the Participant." (*See* Terry Decl., Ex. C-E, H-J, M-O). The same is true of McGlynn's quasi-contractual claims regarding a 2020 bonus, because his Offer Letter specifically stated that he would be "[e]ligible for [a] discretionary Bonus

at the discretion and approval of the Company," without limiting its application to a specific date range.  (McGlynn Offer Letter).

The Court also rejects Plaintiffs' quasi-contractual claims with respect to severance.  The fact that Defendant offered each Plaintiff a written severance agreement — which each Plaintiff strategically refused to sign to avoid releasing Defendant from all claims — evinces the parties' intent to be bound only by a formal written agreement.  *See Valentino* v. *Davis*, 703 N.Y.S.2d 609, 612 (3d Dep't 2000) ("A contract may not be implied in fact from the conduct of the parties where it appears that they intended to be bound only by a formal written agreement.").  Put simply, Plaintiffs cannot state a quasi-contractual claim for severance merely by rejecting Defendant's offer of a contractual severance agreement.

Barker's and Kamai's quasi-contractual claims for a 2020 bonus warrant further analysis, however, as their Offer Letters were silent with respect to bonus eligibility after calendar year 2015.  (Barker Offer Letter; Kamai Offer Letter).  Barker's claim for a commission also requires additional analysis, as no written agreement governs that subject.  Those analyses are set forth in the remainder of this section.

### 1.    Implied Contract

 "Under New York law, a contract implied in fact may result as an inference from the facts and circumstances of the case, though not formally stated in words, and is derived from the presumed intention of the parties as indicated by their conduct."  *Sackin* v. *TransPerfect Glob., Inc.*, 278 F. Supp. 3d

739, 750 (S.D.N.Y. 2017) (citations omitted).  New York courts have held that "an implied contractual relationship may be established by conduct of the parties, as well as by express agreement." *Ferrand* v. *Credit Lyonnais*, No. 02 Civ. 5191 (VM), 2003 WL 22251313, at *12 (S.D.N.Y. Sept. 30, 2003) (citing *Mirchel* v. *RMJ Sec. Corp.*, 613 N.Y.S.2d 876, 878-79 (1st Dep't 1994)), *aff'd*, 110 F. App'x 160 (2d Cir. 2004) (summary order).  "An implied contract, like an express contract, requires 'consideration, mutual assent, legal capacity and legal subject matter.'" *Sackin*, 278 F. Supp. 3d at 750 (citations omitted).  "An implied-in-fact contract is just as binding as an express contract arising from declared intention, since in law there is no distinction between agreements made by words and those made by conduct." *Bader* v. *Wells Fargo Home Mortg. Inc.*, 773 F. Supp. 2d 397, 413 (S.D.N.Y. 2011) (citing *Bear Stearns Inv. Prod., Inc.* v. *Hitachi Auto. Prod. (USA), Inc.*, 401 B.R. 598, 615-16 (S.D.N.Y. 2009)). However, "a contract cannot be implied *in fact* where the facts are inconsistent with its existence ... or where there is an express contract covering the subject-matter involved." *Id.* (citing *Ludemann Elec., Inc.* v. *Dickran*, 903 N.Y.S.2d 532, 534 (2d Dep't 2010) (emphasis in original)); *see also Valentino*, 703 N.Y.S.2d at 612 ("A contract may not be implied in fact from the conduct of the parties where it appears that they intended to be bound only by a formal written agreement.").  Thus "the theories of express contract and of contract implied in fact ... are mutually exclusive." *Bader*, 773 F. Supp. 2d at 414 (citing *Bowne of N.Y., Inc.* v. *Int'l 800 Telecom Corp.*, 576 N.Y.S.2d 573, 574 (1st Dep't 1991)).

The Court finds that Barker and Kamai have adequately pleaded claims for breach of an implied contract with respect to their 2020 bonuses. Barker's and Kamai's Offer Letters are silent with respect to bonus eligibility after calendar year 2015. Whether an implied contract existed between the parties "will ordinarily be a question of fact, as it involves an assessment of the parties' conduct and the extent to which such conduct demonstrates a meeting of the minds." *Int'l Techs. Mktg., Inc.* v. *Verint Sys., Ltd.*, 157 F. Supp. 3d 352, 365 (S.D.N.Y. 2016) (quoting *Monahan* v. *Lewis*, 858 N.Y.S.2d 812, 814 (3d Dep't 2008)), *aff'd*, 850 F. App'x 38 (2d Cir. 2021) (summary order). More specifically, as discussed above, "[i]n the absence of an unambiguous statement of absolute discretion, whether unpaid compensation constituted a discretionary bonus or nonforfeitable earned wages is a question of fact." *Longhi*, 2019 WL 4805735, at *5 (citing *Doolittle* v. *Nixon Peabody LLP*, 6 N.Y.S.3d 864, 866 (2d Dep't 2015)); *see also Kaplan*, 747 N.Y.S.2d at 505.

"The course of dealing between the parties" can evince "an implied promise that annual or semi-annual bonus payments constitute a part of [a] plaintiff's compensation." *Mirchel*, 613 N.Y.S.2d at 879. That the amount of each annual bonus was determined at the end of the year (or in the instant dispute, at the beginning of the following year) does not bar recovery under an implied contract. *See id.* A bonus that has been established to be compensation as a matter of right cannot be withheld because an employee did not work until the date the bonus was to have been paid. *Ferrand*, 2003 WL 22251313, at *13. The question that arises, therefore, is whether the conduct

31

of the parties established that a significant bonus was to be paid to Barker and
Kamai as a matter of course as part of their salary.  In the circumstances of
this case, that is a question of fact that cannot be disposed of at the motion to
dismiss stage.[10]

On the other hand, the Court finds that Barker has not alleged a claim
for breach of implied contract with respect to the commission he seeks for the
loan he originated for the SBA team prior to his departure.  Barker has not
alleged facts raising an inference that an implied contract was formed by the
parties' conduct.  Barker merely alleges that after he originated business for
the SBA team, Connolly said that Barker "should be paid a commission," and
that Connolly told Barker he would have Nager follow up to resolve the issue,
but that Nager did not follow up.  (Barker Compl. ¶¶ 91-92).  These allegations
do not demonstrate the requisite meeting of the minds to form an implied
contract.

### 2.    Unjust Enrichment

Under New York law, unjust enrichment and quantum meruit claims are
analyzed together as a single quasi-contract claim.  "The theory of unjust
enrichment lies as a quasi-contract claim.  It is an obligation the law creates *in*

---

[10]    To be clear, the Court believes that these implied contract claims face dubious
prospects on a motion for summary judgment, as the discretionary nature of the
bonuses is clearly set forth in the Employee Handbook that Plaintiffs were given upon
their hiring.  *See, e.g., Ferrand* v. *Credit Lyonnais*, No. 02 Civ. 5191 (VM), 2003 WL
22251313, at *12-13 (S.D.N.Y. Sept. 30, 2003) (finding that no implied contract existed
under New York law for a guaranteed bonus where there was an explicit policy in the
employer's employee handbook setting forth a policy of discretionary bonuses, despite
non-contractual nature of the handbook), *aff'd*, 110 F. App'x 160 (2d Cir. 2004)
(summary order).  However, as discussed above, the Court is unable to consider the
Employee Handbook on the instant motion.

the absence of any agreement." *Beth Israel Med. Ctr.*, 448 F.3d at 586-87 (emphasis in original) (citing *Goldman* v. *Metro. Life Ins. Co.*, 5 N.Y.3d 561, 572 (2005)).  "To prevail on a claim for unjust enrichment in New York, a plaintiff must establish [i] that the defendant benefitted; [ii] at the plaintiff's expense; and [iii] that equity and good conscience require restitution." *Id.* at 586 (citing *Kaye* v. *Grossman*, 202 F.3d 611, 616 (2d Cir. 2000)).

The Court can readily dispose of Plaintiffs' claims of unjust enrichment. "[T]he law is clear that a plaintiff may not allege that his former employer was 'unjustly' enriched at his expense when the employer compensated the plaintiff by paying him a salary." *Levion* v. *Societe Generale*, 822 F. Supp. 2d 390, 405 (S.D.N.Y. 2011) (citation omitted), *aff'd*, 503 F. App'x 62 (2d Cir. 2012) (summary order); *see also Karmilowicz* v. *Hartford Fin. Servs. Grp.*, No. 11 Civ. 539 (CM) (DCF), 2011 WL 2936013, at *12 (S.D.N.Y. July 14, 2011) (finding that incentive compensation was designed to reward exceptional employees by supplementing their salaries, and therefore that employee's unjust enrichment claim failed), *aff'd sub nom. Karmilowicz* v. *Hartford Fin. Servs. Gr., Inc.*, 494 F. App'x 153 (2d Cir. 2012) (summary order).

### 3.    Promissory Estoppel

"[T]o state a claim for promissory estoppel under New York law, Plaintiff must allege: '[i] a sufficiently clear and unambiguous promise; [ii] reasonable reliance on the promise; and [iii] injury caused by the reliance[.]'" *Hewes* v. *Democratic Nat'l Comm.*, No. 19 Civ. 7784 (KPF), 2021 WL 706619, at *6 (S.D.N.Y. Feb. 22, 2021) (quoting *Castellotti* v. *Free*, 27 N.Y.S.3d 507, 513 (1st

Dep't 2016)).  "Promissory estoppel is a legal fiction designed to substitute for contractual consideration where one party relied on another's promise without having entered into an enforceable contract." *Bader*, 773 F. Supp. 2d at 414 (citing *Randolph Equities, LLC* v. *Carbon Capital, Inc.*, 648 F. Supp. 2d 507, 523 (S.D.N.Y. 2009)).  "A promise that is too vague or too indefinite is not actionable under a theory of promissory estoppel; the alleged promise must be clear and unambiguous." *Hewes*, 2021 WL 706619, at *6 (internal citations and quotations omitted).

The Court finds that Barker and Kamai have failed to plead plausible claims for promissory estoppel with respect to their 2020 bonuses.  The only specific "promise" Barker alleges with respect to his bonus eligibility is Wechsler's promise that he would receive a bonus in 2016 for performance in 2015, and that it would be between 16-20% of the revenue that Barker made for Bancorp.  (Barker Compl. ¶¶ 31-32).  This promise is unrelated to Barker's eligibility for a bonus in 2020.  Kamai does not allege that anybody made any promise to him regarding his 2020 bonus.

Similarly, the Court finds that Barker has not alleged a claim for promissory estoppel with respect to his commission.  Connolly's oral statements that Barker "should be paid a commission" and that he would have Nager follow up with Barker to resolve the issue (*see* Barker Compl. ¶¶ 91-92) are simply too indefinite and vague to be enforced under New York law.  *See Bice* v. *Robb*, 511 F. App'x 108, 109 (2d Cir. 2013) (summary order) (holding that oral promise to "take care of the family" is "far too indefinite and vague to

34

be enforced" under New York law); *see also Hewes*, 2021 WL 706619, at *6 (dismissing plaintiff's promissory estoppel claim where plaintiff "provide[d] none of the basic information required to establish the existence of any purported promise, much less a valid, binding agreement"). Even if these statements were found to be definite promises, Barker cannot allege reliance on any promise with respect to the commission. After all, Connolly's statements were made only *after* Barker acted. Therefore, Barker has not pleaded promissory estoppel with respect to a commission.

### D. The Court Denies Leave to Amend

Lastly, the Court considers whether to grant Plaintiffs leave to amend. Federal Rule of Civil Procedure 15(a)(2) provides that a court should freely grant leave to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2); *see also McCarthy* v. *Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). That said, it remains "within the sound discretion of the district court to grant or deny leave to amend." *Broidy Cap. Mgmt. LLC* v. *Benomar*, 944 F.3d 436, 447 (2d Cir. 2019). Leave may be denied where, as here, a plaintiff does not request to amend his pleading. *Gallop* v. *Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (observing that "no court can be said to have erred in failing to grant a request that was not made"); *see also Morey* v. *Windsong Radiology Grp., P.C.*, 794 F. App'x 30, 34 (2d Cir. 2019) (summary order) (holding that "the district court did not abuse its discretion in declining to *sua sponte* allow [plaintiff] leave to file an amended complaint"). Further, leave may be denied where the proposed amendment would be futile. *See Olson* v. *Major League Baseball*, 447

35

F. Supp. 3d 174, 177 (S.D.N.Y. 2020).  Amendment is futile if the "amended portion of the complaint would fail to state a cause of action."  *Parker* v. *Columbia Pictures Indus.*, 204 F.3d 326, 339 (2d Cir. 2000); *see also Kassner* v. *2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 244 (2d Cir. 2007) (finding amendment not futile where amended complaint would be "sufficient to withstand a motion to dismiss").

Plaintiffs have declined to take advantage of previous opportunities to amend their Complaints, and the Court sees no reason to afford them an opportunity they have not sought.  *First*, Plaintiffs did not amend their Complaints as of right pursuant to Federal Rule of Civil Procedure 15(a)(1). *Second*, Plaintiffs did not amend after the Court granted them leave to amend during the parties' pre-motion conference on April 8, 2021, even though the Court advised Plaintiffs' counsel that he should "very seriously consider amending." (Dkt. #10 at 29:16-17).  *Third*, Plaintiffs have not requested leave to amend in their briefing on the instant motion.  The Court therefore denies Plaintiffs leave to amend.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss Plaintiffs' breach-of-contract and quasi-contractual claims under Federal Rule of Civil Procedure 12(b)(6) is GRANTED IN PART and DENIED IN PART.

With respect to the *Barker* case (No. 21 Civ. 869), the Court GRANTS Defendant's motion to dismiss Counts One (Breach of Contract), Three (Unjust Enrichment), and Four (Promissory Estoppel) of the Complaint.  The Court

additionally GRANTS Defendant's motion to dismiss Count Two (Breach of Implied Contract) with respect to Barker's claim that he is entitled to an award of stock, severance, and a commission.  The Court DENIES Defendant's motion to dismiss Count Two (Breach of Implied Contract) with respect to Barker's claim that he is entitled to a bonus for the work he performed in 2020.  The Clerk of Court is directed to terminate the pending motion at docket number 12.

With respect to the *Kamai* case (No. 21 Civ. 896), the Court GRANTS Defendant's motion to dismiss Counts One (Breach of Contract), Three (Unjust Enrichment), and Four (Promissory Estoppel) of the Complaint.  The Court additionally GRANTS Defendant's motion to dismiss Count Two (Breach of Implied Contract) with respect to Kamai's claim that he is entitled to an award of stock and severance.  The Court DENIES Defendant's motion to dismiss Count Two (Breach of Implied Contract) with respect to Kamai's claim that he is entitled to a bonus for the work he performed in 2020.  The Clerk of Court is directed to terminate the pending motion at docket number 10.

With respect to the *McGlynn* case (No. 21 Civ. 897), the Court GRANTS Defendant's motion to dismiss in its entirety.  The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

The Clerk of Court is directed to file this Opinion in all three cases.  The remaining parties are directed to submit a joint letter and Proposed Case Management Plan and Scheduling Order on or before **March 18, 2022**.

SO ORDERED.

Dated:      February 25, 2022
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge