UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN EDWARD BARKER,<br><br>                    Plaintiff,<br><br>              -v.-<br><br>THE BANCORP, INC.,<br><br>                    Defendant. | 21 Civ. 869 (KPF)<br><br>**OPINION AND ORDER** |
| ALEXANDER JOHN KAMAI,<br><br>                    Plaintiff,<br><br>              -v.-<br><br>THE BANCORP, INC.,<br><br>                    Defendant. | 21 Civ. 896 (KPF) |

KATHERINE POLK FAILLA, District Judge:

Plaintiffs Alexander Kamai, John Barker, and John McGlynn initially brought related actions in New York State Supreme Court against their former employer, The Bancorp, Inc. ("Bancorp" or "Defendant"), seeking unpaid bonuses and other compensation to which Plaintiffs believed they were entitled for their work in 2020. Defendant removed the cases to federal court in February 2021, and subsequently moved to dismiss Plaintiffs' claims.

In an Opinion and Order dated February 25, 2022, the Court granted in part and denied in part Defendant's combined motion to dismiss, leaving in place only Barker's and Kamai's breach of implied contract claims with respect to their respective 2020 bonuses. *See Barker* v. *Bancorp, Inc.*, Nos. 21 Civ. 869 (KPF), 21 Civ. 896 (KPF), 21 Civ. 897 (KPF), 2022 WL 595954 (S.D.N.Y. Feb. 25,

2022) ("*Bancorp I*").[1]  The Court resolved Defendant's motion in this manner after concluding that it could not consider the Bancorp Employee Handbook (the "Handbook") at the motion to dismiss stage.  *See id.* at *13 n.10 ("To be clear, the Court believes that these implied contracts face dubious prospects on a motion for summary judgment, as the discretionary nature of the bonuses is clearly set forth in the … Handbook that Plaintiffs were given upon their hiring. …  However, as discussed above, the Court is unable to consider the … Handbook on the instant motion.")

With discovery now complete, before the Court is Defendant's combined motion for summary judgment as to the remaining implied contract claims. Now able to consider the express terms of the Handbook, the Court finds that no implied contract existed between the parties and, as such, grants Defendant's motion.

## BACKGROUND[2]

## A.   Factual Background

### 1.   Plaintiffs' Tenures at Bancorp

Plaintiff Kamai was employed at Bancorp from January 2015 until on or about October 30, 2020.  (Def. 56.1 (Kamai) ¶ 1).  Plaintiff Barker began his

---

[1]    Unless otherwise indicated, references to "Plaintiffs" in this Opinion refer to Barker and Kamai only.

[2]    The Court refers to docket entries in the action brought by John Barker (No. 21 Civ. 869) as "Barker Dkt. #___"; those in the action brought by Alexander Kamai (No. 21 Civ. 896) as "Kamai Dkt. #___"; and those in the action brought by John McGlynn (No. 21 Civ. 897) as "McGlynn Dkt. #___."  The *McGlynn* action was dismissed in full in *Barker I*. Where combined memoranda of law were filed across all dockets, the Court cites to the *Barker* docket only.

The facts set forth in this Opinion are drawn from the parties' submissions in connection with Defendant's motion for summary judgment.  The Court primarily

employment with Bancorp just a few months later, in June 2015, and ended

that employment also on or about October 30, 2020.  (Def. 56.1 (Barker) ¶ 1).

Prior to their start dates, Kamai and Barker received offers of employment from

Bancorp on January 7, 2015, and June 11, 2015, respectively.  (Def. 56.1

(Kamai) ¶ 2; Def. 56.1 (Barker) ¶ 2).  Barker's offer letter stated that he was

being hired as a Managing Director in the firm's Commercial Mortgage Backed

Securitization division ("CMBS"); that his initial annual base salary would be

$250,000; and that he would report directly to Ron Wechsler, the Executive

---

sources facts from Defendant's Local Rule 56.1 Statements as to each Plaintiff (Barker Dkt. #37 ("Def. 56.1 (Barker)"), and Kamai Dkt. #30 ("Def. 56.1 (Kamai)")), and from each Plaintiff's Local Rule 56.1 Responses to Defendant's Rule 56.1 Statements (Barker Dkt. #42 ("Barker 56.1"), and Kamai Dkt. #35 ("Kamai 56.1")).  The Court draws additional facts from certain of the exhibits attached to the Declaration of Michael C. Schmidt, including the Barker Offer Letter ("Barker Offer Letter" (Barker Dkt. #38-9)), the Kamai Offer Letter ("Kamai Offer Letter" (Barker Dkt. #38-10)), the Employee Handbook (the "Handbook" (Barker Dkt. #38-11)), Barker's acknowledgement of his receipt of the Handbook ("Barker Acknowledgement" (Barker Dkt. #38-12)), Kamai's acknowledgment of his receipt of the Handbook ("Kamai Acknowledgement (Barker Dkt. #38-13)), and the deposition testimony of various individuals, cited using the convention "[ ] Dep." (Barker Dkt. #38-3 to 38-7).

Citations to a party's Rule 56.1 Statement incorporate by reference the documents and testimony cited therein.  Where a fact stated in a movant's Rule 56.1 Statement is supported by evidence and controverted only by a conclusory statement by the opposing party, the Court finds that fact to be true.  *See* Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be submitted by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

Where Plaintiffs agree to a fact set forth in either or both of Defendant's Rule 56.1 Statements in its entirety, the Court cites only to Defendant's Rule 56.1 Statement.  Additionally, where an undisputed fact applicable to both Kamai and Barker appears in both of Defendant's Rule 56.1 Statements, the Court cites only to the Rule 56.1 Statement filed in the *Barker* action.

For ease of reference, the Court refers to Defendant's memorandum of law in support of its motion for summary judgment as "Def. Br." (Barker Dkt. #39); to Plaintiffs' joint memorandum of law in opposition to Defendant's motion as "Pl. Opp." (Barker Dkt. #40); and to Defendant's reply memorandum of law as "Def. Reply" (Barker Dkt. #43).

Vice President of CMBS.  (Def. 56.1 (Barker) ¶¶ 3, 6-8; Barker Offer Letter).
Kamai's letter specified that he was being hired as an Analyst in the same
division; would earn an initial annual salary of $85,000; and would similarly
report to Wechsler.  (Def. 56.1 (Kamai) ¶¶ 3, 6-8; Kamai Offer Letter).
Wechsler, in turn, reported to Bancorp Chief Executive Officer Damian
Kozlowski.  (Def. 56.1 (Barker) ¶ 8).  Both offer letters contained the same
language regarding bonus eligibility, noting that each Plaintiff would be
"[e]ligible for [a] discretionary bonus at the discretion and approval of The
Bancorp for calendar year 2015, payable in early 2016."  (Def. 56.1 (Barker)
¶ 4; Def. 56.1 (Kamai) ¶ 4).

Kamai's base salary rose steadily throughout his employment, and by the
time of his termination — at which point he was a loan underwriter on the Real
Estate Capital Markets team ("RECM," previously CMBS) — his annual salary
amounted to $170,783.  (Def. 56.1 (Kamai) ¶¶ 6-7, 10).  Barker's base salary
similarly increased through 2017, when he began making an annual salary of
$315,000.  (Def. 56.1 (Barker) ¶ 10).  His salary remained at that figure up to
and including the date of his termination, at which point he was a Managing
Director and Senior Loan Originator on the RECM team.  (*Id.* ¶¶ 6-7, 10).  Both
Barker and Kamai were paid their respective salaries through the time of their
separations from the firm, and neither has claimed that Bancorp failed to pay
them any portion of their base salaries at any point during their periods of
employment.  (Def. 56.1 (Kamai) ¶¶ 9, 11; Def. 56.1 (Barker) 56.1 ¶¶ 9, 11).

### 2.     The Termination of Plaintiffs' Employment

The year 2020 presented a series of challenges for the world and, as relevant here, for the markets on which the RECM team focused.  (Def. 56.1 (Barker) ¶¶ 12-13).  Beginning sometime toward the end of the first quarter or the beginning of the second quarter of that year, the relevant markets began to shut down due to the COVID-19 pandemic, and the RECM team was told that they could not originate new loans as a result.  (*Id.* ¶ 13).  By the end of April 2020, the RECM team was no longer operating as it had been prior to that year, and the loans originated by the RECM team were no longer being securitized.  (Def. 56.1 (Barker) 56.1 ¶ 14; Barker 56.1 ¶ 14, Def. 56.1 (Kamai) ¶ 14; Kamai 56.1 ¶ 14).[3]

In or about July or August 2020, Kozlowski determined that the market would not improve sufficiently in the short term to warrant securitizing the pool of loans that had been previously identified for that purpose.  (Def. 56.1 (Barker) ¶ 15; Barker 56.1 ¶ 15).  As a result, in August or September 2020, Kozlowski determined that Bancorp would wind down its portfolio over the next few years and that RECM team members' employments would be terminated, unless a particular member was needed to help manage and wind down the

---

[3]     Plaintiffs purport to dispute this fact, noting that in "early 2020" each Plaintiff successfully performed his typical job function.  (*See* Kamai 56.1 ¶ 14 ("Kamai still performed in early 2020 by underwriting and closing 219 million dollars' worth of loans"); Barker 56.1 ¶ 14 ("Barker still performed in early 2020 by making Bancorp approximately 30 million dollars and maintaining the health of many of the loans in the $735 million portfolio")).  While the Court understands Plaintiffs' desire to make their individual efforts known, they have not refuted, or even generated a triable dispute concerning, Defendant's factual statements about market conditions or the RECM team's future prospects.

portfolio (as opposed to originating and underwriting new loans).  (Def. 56.1 (Barker) ¶ 16).

On September 14, 2020, Bancorp announced to Kamai, Barker, and the rest of the RECM team that the company would be exiting the real estate securitization business and that their employment would thus be terminated. (Def. 56.1 (Barker) ¶ 17; Def. 56.1 (Kamai) ¶ 17).  At some point later, but prior to Plaintiffs' last day of employment on October 30, 2020, RECM team members were told that Bancorp would not be providing them with bonuses for the 2020 year in light of Bancorp's withdrawal from the RECM market and its consequent decision to terminate the division as a whole.  (Def. 56.1 (Barker) ¶¶ 17-19; Def. 56.1 (Kamai) ¶¶ 17-19).

### 3. The Discretionary Bonus Policy at Bancorp

Bancorp maintained the Handbook during Plaintiffs' employment.  (Def. 56.1 (Barker) ¶ 20).  Section 4.14 of the Handbook contained an express policy regarding "Incentive Compensation" for eligible employees that provided, among other things, that "[i]ncentive compensation is solely at the discretion of the Company and may be changed or eliminated at any time."  (*Id.* ¶ 21).  The Handbook also stated that "[n]o representative of the Company (unless approved by the Company's CEO or President, *in writing*) has the authority to ... make any promises with respect to compensation."  (*Id.* ¶ 22).  More broadly, the Handbook recited that it

> is not intended to and does not create an express or implied contract of employment or any other contractual rights, obligations or liabilities. Because this Handbook is not a contract, it does not contain any

6

promises by the Company and the Company is not
contractually or otherwise legally bound to it.

(Handbook 2).

Kamai and Barker were asked to review and acknowledge their receipt of
the Handbook, which they did on December 11, 2019, and December 13, 2019,
respectively.  (Def. 56.1 (Kamai) ¶ 23; Def. 56.1 (Barker) ¶ 23; Kamai
Acknowledgment; Barker Acknowledgment)).  Neither Plaintiff is aware of any
written document guaranteeing them a bonus for each year of their
employment, or stating that they were entitled to a bonus for the 2020 year.
(Def. 56.1 (Barker) ¶¶ 24-25; Barker 56.1 ¶ 25; Def. 56.1 (Kamai) ¶¶ 24-25;
Kamai 56.1 ¶ 25).[4]  In his deposition, Bancorp CEO Kozlowski testified that
any bonus pool Bancorp created for the RECM Team was a discretionary one.
(Def. 56.1 (Barker) ¶ 26; Kozlowski Dep. 35:19-36:24, 49:9-50:8).  Other
members of Bancorp's senior management have stated that they held a similar
understanding of the bonuses' discretionary nature, including Daniel Cohen,
former Chairman of Bancorp's holding company and former Executive Vice
President of Bancorp, and Wechsler, who noted that bonuses were at all times
subject to Bancorp's approval, even if Wechsler could make a recommendation

---

[4]     Plaintiffs note that "[w]hether or not [Plaintiffs] w[ere] entitled to a bonus for calendar
        year 2020 is the heart of this dispute. [Plaintiffs] received verbal communications and
        agreements every year of employment at Bancorp that [they] would receive a bonus as
        long as [they] performed and generated revenue, including in 2020."  (Kamai 56.1 ¶ 25;
        Barker 56.1 ¶ 25).  Such superficial disputes that merely summarize Plaintiffs'
        arguments and do not, in fact, dispute the fact at issue, do not suffice under Rule 56
        and the relevant caselaw.

as to members of his group.  (Cohen Dep. 37:4-8, 40:7-14; Wechsler

Dep. 77:18-78:16).

### 4.    The Bonus Pool and the Dissolution of the RECM Team

In the years prior to 2020, Kozlowski and other finance and senior

management employees at Bancorp worked to arrive at a total discretionary

bonus pool, from which Kozlowski authorized Wechsler to make a

recommendation for allocations to members of the RECM team based on

production and revenue, less expenses and costs.  (Def. 56.1 (Barker) ¶¶ 30-31;

Barker 56.1 ¶ 30).  Wechsler understood that any bonus recommendations he

may have made were subject to approval by Kozlowski.  (Wechsler Dep. 20:16-

24 (noting that Kozlowski would have to approve all bonus recommendations

that he made); *see also* Kozlowski Dep. 39:19-22 ("I wouldn't call it my

approval, but I would agree with the number, you could call it approval, and

then it would go to the comp committee of the Board for approval.")).[5]  Once

past Kozlowski, the entire bonus allocation calculation was then subject to

approval by the Compensation Committee of Bancorp's Board of Directors.

(Def. 56.1 (Barker) ¶ 34).  And both Kamai and Barker understood that

Wechsler could make recommendations as to the allocation of bonuses, but

that he could not make the final decisions when it came to the payment of

---

[5]    Plaintiffs' efforts to dispute the fact that Wechsler's recommendations required
Kozlowski's approval are undercut by their subsequent admission that they understood
Wechsler to lack final authority to award bonuses.  (*Compare* Kamai 56.1 ¶¶ 32-33, *and*
Barker 56.1 ¶¶ 32-33 ("disputing" the need for Kozlowski's approval), *with* Kamai 56.1
¶ 35, *and* Barker 56.1 ¶ 35 (noting that it was "[u]ndisputed" that each Plaintiff
"understood that Wechsler did not make the final decisions when it came to the
payment of bonuses at The Bancorp, and further understood that Wechsler needed
approval from … Kozlowski for any bonuses to be paid in a given year")).

bonuses.  (*See* Def. 56.1 (Kamai) 56.1 ¶¶ 34-35; Def. 56.1 (Barker) 56.1 ¶¶ 34-35)).

During the years prior to 2020 in which RECM was allocated a portion of the bonus pool, Barker, Kamai, and others on the RECM Team would receive a written communication in the early part of the year confirming that they would be awarded a bonus for performance in the prior year.  (Def. 56.1 (Kamai) ¶ 36).  Neither Kamai nor Barker received such a communication in the early part of 2021.  (Def. 56.1 (Kamai) ¶ 37; Def. 56.1 (Barker) ¶ 37).  This silence coincided with Bancorp's decisions not to securitize loans in 2020 and, to the contrary, to exit the RECM Team's business, all of which obviated the need to engage in any bonus pool calculation.  (Def. 56.1 (Barker) ¶ 38; *see also* Barker 56.1 ¶ 38, Kamai 56.1 ¶ 38 (both noting that Plaintiffs were unaware whether other members of the RECM team received bonuses that year)).  In point of fact, Kozlowski informed Wechsler in 2021 that because the RECM team had stopped originating and underwriting new loans, due in part to the COVID-19 pandemic, there would be no discretionary bonus pool for that team for 2020. (Def. 56.1 (Barker) ¶ 39).

## B.   Procedural Background

Plaintiffs Kamai and Barker, along with McGlynn, initiated these actions by filing their respective complaints in the Supreme Court of the State of New York, County of New York, on January 12, 2021.  (Barker Dkt. #1 ¶ 1; Kamai Dkt. #1 ¶ 1; McGlynn Dkt. #1 ¶ 1).  On February 1, 2021, Defendant removed the *Barker* action to this Court (Barker Dkt. #1), and the following day removed

the remaining *Kamai* and *McGlynn* actions (Kamai Dkt. #1; McGlynn Dkt. #1).
The Court accepted the *Kamai* and *McGlynn* actions as related to the *Barker*
action on February 9, 2021.  (Kamai Dkt. February 9, 2021 Minute Entry;
McGlynn Dkt. February 9, 2021 Minute Entry).  On February 26, 2021,
Defendant filed a pre-motion letter regarding its anticipated motion to dismiss
the three complaints.  (Barker Dkt. #7).  After receiving Plaintiffs' omnibus
letter in opposition (Barker Dkt. #8), the Court held a pre-motion conference on
April 8, 2021, during which it set forth a briefing schedule (Barker April 8,
2021 Minute Entry).

   Pursuant to that schedule, Defendant filed its combined motion to
dismiss the complaints and supporting papers on June 11, 2021.  (Barker Dkt.
#12-14; *see also* Barker Dkt. #17-18 (additional motion briefing)).  On
February 25, 2022, the Court issued an Opinion and Order granting in part
and denying in part Defendant's motion, leaving only Kamai's and Barker's
claims for breach of implied contract.  (Barker Dkt. #21).

   On March 22, 2022, the Court entered the parties' case management
plan.  (Barker Dkt. #24).  Following the close of fact discovery, the Court held a
conference on August 11, 2022, during which it set a briefing schedule for
Defendant's combined motion for summary judgment.  (*See* Barker Dkt.
August 11, 2022 Minute Entry).  Pursuant to that schedule, Defendant
submitted its motion for summary judgment and supporting papers on
September 29, 2022 (Barker Dkt. #36-39; Kamai Dkt. #29-32), which papers
included two Rule 56.1 Statements, one as to Plaintiff Barker (Barker Dkt. #37)

10

and one as to Plaintiff Kamai (Kamai Dkt. #30).  Plaintiffs filed their combined

opposition briefing on November 11, 2022 (Barker Dkt. #40-42; Kamai Dkt.

#33-35), and included separate counterstatements for each Rule 56.1

statement (Barker Dkt. #42; Kamai Dkt. #35).  Defendant filed its combined

reply memorandum in further support of its motion on December 2, 2022

(Barker Dkt. #43; Kamai Dkt. #36), along with replies to each Plaintiff's Rule

56.1 counterstatement (Barker Dkt. #44; Kamai Dkt. #37).

**DISCUSSION**

A.   **Motions for Summary Judgment Under Federal Rule of Civil**
     **Procedure 56**

Summary judgment is appropriate when "there is no genuine dispute as

to any material fact and the moving party is entitled to a judgment as a matter

of law."  Fed. R. Civ. P. 56(a).  "[T]he dispute about a material fact is

'genuine[ ]' ... if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party."  *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit

under the governing law," and "[f]actual disputes that are irrelevant or

unnecessary will not be counted."  *Id.*

On a motion for summary judgment, the moving party bears the initial

burden of establishing that no genuine factual dispute exists; if satisfied, the

burden shifts to the nonmoving party to "set forth specific facts showing that

there is a genuine issue for trial," *Anderson*, 477 U.S. at 256, and to present

such evidence that would "allow a reasonable jury to find in his favor," *Graham*

v. *Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).  To defeat a summary

11

judgment motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by … citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "If a party fails … to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2), (3).

Finally, in considering a summary judgment motion, a court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Wells Fargo Bank, Nat'l Ass'n as Tr. for Benefit of Holders of Comm. 2015-LC19 Mortg. Tr. Com. Mortg. Pass-Through Certificates* v. *5615 N. LLC*, No. 20 Civ. 2048 (VSB), 2022 WL 15523689, at *4 (S.D.N.Y. Oct. 27, 2022) (quoting *Allen* v. *Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (internal quotation marks and citation omitted)); *see also Matsushita*, 475 U.S. at 587. "[I]f there is any

12

evidence in the record that could reasonably support a jury's verdict for the non-moving party," summary judgment must be denied. *Marvel Characters, Inc.* v. *Simon*, 310 F.3d 280, 286 (2d Cir. 2002).

## B.   The Court Grants Defendant's Motion for Summary Judgment

Now that the Court is able to consider Bancorp's Handbook, Plaintiffs are constrained to argue against its express language, contending in relevant part that (i) because they received bonuses over the course of roughly five years and received oral representations from Wechsler that they would continue to do so, Defendant engaged in a course of conduct sufficient to establish an implied contract (Pl. Opp. 10-13); (ii) because the Handbook is not binding and Plaintiffs did not receive it until 2019, its terms are insufficient to overcome this course of conduct (*id.* at 13-15); and (iii) because their offer letters only stated that bonuses for the *2015* year were discretionary, and were silent as to awards for subsequent years, there exists a genuine dispute of material fact sufficient to overcome Defendant's motion (*id.* at 15-16).  For the reasons set forth in the remainder of this section, the Court finds that Plaintiffs were bound by the express terms of the Handbook, and that any claim for breach of implied contract is dead on arrival.  Accordingly, the Court grants Defendant's combined motion for summary judgment in full.

### 1.   Implied Contracts Under New York Law

Under New York law, where there is no written express agreement between parties, "a contract may be implied where inferences may be drawn from the facts and circumstances of the case and the intention of the parties as

13

indicated by their conduct." *Bear Stearns Inv. Prod., Inc.* v. *Hitachi Auto. Prod. (USA), Inc.*, 401 B.R. 598, 615 (S.D.N.Y. 2009) (quoting *Ellis* v. *Provident Life & Accident Ins. Co.,* 3 F. Supp. 2d 399, 409 (S.D.N.Y. 1998)).  "[A]n implied-in-fact contract arises 'when the agreement and promise have simply not been expressed in words,' but 'a court may justifiably infer that the promise would have been explicitly made, had attention been drawn to it.'" *Nadel* v. *Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368, 376 n.5 (2d Cir. 2000) (quoting *Maas* v. *Cornell Univ.,* 94 N.Y.2d 87, 93-94 (1999)).  Like an express contract, an implied contract requires "'consideration, mutual assent, legal capacity and legal subject matter' to be established." *Fink* v. *Time Warner Cable*, 810 F. Supp. 2d 633, 645 (S.D.N.Y. 2011) (quoting *Maas*, 94 N.Y.2d at 94).  And for a contract to be implied in fact, there indeed "must be proof of a meeting of the minds," *Amcat Glob., Inc.* v. *Greater Binghamton Dev., LLC*, 33 N.Y.S.3d 555, 558 (3d Dep't 2016) (quoting *I.G. Second Generation Partners, L.P.* v. *Duane Reade,* 793 N.Y.S.2d 206, 208 (1st Dep't 2005)), because such a contract "is derived from the presumed intention of the parties as indicated by their conduct," *Sackin* v. *TransPerfect Glob., Inc.*, 278 F. Supp. 3d 739, 750 (S.D.N.Y. 2017) (internal quotation marks and citations omitted).

Significantly, however, a contract cannot "be implied in fact where the facts are inconsistent with its existence ... or where there is an express contract covering the subject-matter involved, or against the ... understanding of the parties." *Betty, Inc.* v. *PepsiCo, Inc.*, 283 F. Supp. 3d 154, 167 (S.D.N.Y. 2017) (quoting *Miller* v. *Schloss*, 218 N.Y. 400, 406-07 (1916)); *see also*

*Valentino* v. *Davis*, 703 N.Y.S.2d 609, 612 (3d Dep't 2000) ("A contract may not be implied in fact from the conduct of the parties where it appears that they intended to be bound only by a formal written agreement." (internal quotation marks and citations omitted)).  In other words, "the theories of express contract and of contract implied in fact ... are mutually exclusive." *Bader* v. *Wells Fargo Home Mortg. Inc.*, 773 F. Supp. 2d 397, 414 (S.D.N.Y. 2011) (quoting *Bowne of N.Y., Inc.* v. *Int'l 800 Telecom Corp.*, 576 N.Y.S.2d 573, 574 (1st Dep't 1991) (internal quotation marks omitted)).

   2.   **Analysis**

   Plaintiffs argue that an implied contract came into being because (i) they each received bonuses in several consecutive years and (ii) a Bancorp executive, albeit one lacking the requisite authority, opined that this practice would continue.  But for conduct to give rise to an implied contract binding a party to continue that conduct in the future, there must be more than mere repeated occurrence; a court must "justifiably be able to infer that the promise would have been explicitly made, had attention been drawn to it." *Nadel*, 208 F.3d at 376 n.5.  As the Court will explain, Plaintiffs' claims cannot survive because in this case Defendant's attention *had* been "drawn to" this precise issue.  And in the clearest terms possible, Defendant defined its performance bonuses as discretionary.  As noted in *Barker I*, the primary reason the Court did not dispose with the implied contract claims at the motion to dismiss stage was because it was unable to consider the Handbook.  *See Barker I*, 2022 WL 595954, at *13 n.10.  Now able to do so alongside each Plaintiff's Offer Letter

15

and a surfeit of deposition testimony confirming the bonuses' discretionary nature, the Court finds that no implied contract exists.

It is true that whether an implied contract existed "will ordinarily be a question of fact, as it involves an assessment of the parties' conduct and the extent to which such conduct demonstrates a meeting of the minds." *Int'l Techs. Mktg., Inc.* v. *Verint Sys., Ltd.*, 157 F. Supp. 3d 352, 365 (S.D.N.Y. 2016) (quoting *Monahan* v. *Lewis*, 858 N.Y.S.2d 812, 814 (3d Dep't 2008)), *aff'd*, 850 F. App'x 38 (2d Cir. 2021) (summary order). The introduction of the Handbook into the analysis, however, presents the exception to this rule. *See Ferrand* v. *Credit Lyonnais*, No. 02 Civ. 5191 (VM), 2003 WL 22251313, at *12 (S.D.N.Y. Sept. 30, 2003) (noting that New York courts have found that this issue can be resolved as a matter of law where "the bonus compensation sought was clearly stated in the company handbook to be purely discretionary" (quoting *Kaplan* v. *Capital Co. of Am. LLC*, 747 N.Y.S.2d 504, 505 (1st Dep't 2002))), *aff'd,* 110 F. App'x 160 (2d Cir. 2004) (summary order). In such cases, courts applying New York law have consistently held that even if a handbook is non-contractual in nature, a clearly-delineated discretionary bonus policy bars a plaintiff from asserting an implied contract claim. *See, e.g.*, *id.* ("even if the policies embodied in the handbook were not intended to be contractual, the provision indicating that bonuses are discretionary should not be read to 'render the handbook wholly nugatory'" (quoting *Kaplan*, 747 N.Y.S.2d at 505); *Welland* v. *Citigroup, Inc.*, No. 00 Civ. 738 (NRB), 2003 WL 22973574, at *15 (S.D.N.Y. Dec. 17, 2003) ("an employee has no enforceable right to compensation under a

discretionary compensation or bonus plan" (internal quotation marks and citation omitted)); *O'Shea* v. *Bidcom, Inc.*, No. 01 Civ. 3855 (WHP), 2002 WL 1610942, at *3 (S.D.N.Y. Jul. 22, 2002) (holding that "[i]t is axiomatic that a promise to pay incentive compensation is unenforceable if the written terms of the compensation plan make clear that the employer has absolute discretion in deciding whether to pay the incentive"); *see also DeSantis* v. *Deutsche Bank Tr. Co. Americas, Inc.*, 501 F. Supp. 2d 593, 601 (S.D.N.Y. 2007) (granting summary judgment for defendant on implied contract claim where company handbook clearly stated bonuses were discretionary and plaintiff testified that he understood bonus procedures and had no written agreement guaranteeing him a bonus); *see also Hall* v. *United Parcel Serv. of Am., Inc.*, 76 N.Y.2d 27, 36 (1990) ("An employee's entitlement to a bonus is governed by the terms of the employer's bonus plan."), *cited in Truelove* v. *Northeast Capital & Advisory Inc.*, 95 N.Y.2d 220, 225 (2000).  Stated differently, "where a bonus policy expressly reserves the right to the employer to pay or not pay bonuses, employees cannot claim a vested right or entitlement to payment of a bonus under that policy," even when that policy was not formally in place at the time of their initial employment.  *Cancro* v. *Credit Agricole Indosuez Severance Pay Program*, No. 05 Civ. 2023 (RJS), 2009 WL 8573475, at *8 (S.D.N.Y. Apr. 15, 2009) (internal quotation marks and citations omitted).  The instant cases are no different.

It is undisputed that the Handbook was in effect during the period of Plaintiffs' employment, and that they received and read its terms.  (Def. 56.1 (Barker) ¶¶ 20-23; Def. 56.1 (Kamai) ¶¶ 20-23; Barker Acknowledgment; Kamai

Acknowledgment).  The Handbook explicitly provides that Bancorp retained full discretion to determine whether and in what amount bonuses are given, and that such decisions were subject to the approval of Kozlowski.  (Handbook 2, § 4.14).

In support of their implied contract claims, Plaintiffs point to their prior receipt of significant bonuses and to Wechsler's representations that they would both receive bonuses and be compensated as long as they produced revenue for the company.  (Pl. Opp. 3-6).  These arguments are of no moment given the express terms of the Handbook and the unambiguous caselaw on the matter.  For example, in *Ferrand* v. *Credit Lyonnais*, the plaintiff employee's offer letter provided for an annual salary of $150,000 and a minimum guaranteed bonus of $250,000 for her first year of employment; the plaintiff was also provided an employee handbook that stated, in relevant part, that "[m]anagement ... may, in its discretion, grant a bonus to any or all of its employees ...  Payment of a bonus is not guaranteed; management may choose to grant or not grant a bonus at year-end to any or all of its employees."  2003 WL 22251313, at *1.  The plaintiff was guaranteed no bonuses beyond her first year, but received bonus compensation in excess of $700,000 in each of the next two years, all the while receiving glowing performance reviews.  *Id.* at *1. The following year, however, the plaintiff received only a $50,000 bonus, and filed an action claiming breach of an implied contract for a more substantial bonus.  *Id.* at *2, *12.

18

The *Ferrand* court found that no implied contract arose from either the parties' conduct or the relevant agreements.  2003 WL 22251313, at *12-13. Animating the court's ruling was the fact that the plaintiff had been given an employee handbook clearly setting forth the discretionary nature of the bonus policy, and thus was "on notice of the possibility that she would receive little or no bonus in a given year."  *Id.* at 12.  Further, the court specifically addressed the fact that the handbook in that case was not "contractual," noting that the non-contractual nature did not "render inapplicable an employer's policy of giving bonuses on a discretionary basis."  *Id.* at 13.  Ultimately, the *Ferrand* court held that the plaintiff was "preclude[d from] raising a claim for an implied contract for a guaranteed bonus where there was an explicit policy in the [b]ank's [e]mployee [h]andbook setting forth a policy of discretionary bonuses." *Id.*

Here, as in *Ferrand*, Plaintiffs were given a non-contractual employee handbook that clearly and unambiguously set forth a policy of discretionary bonuses.  (*See* Handbook § 4.14 ("[i]ncentive compensation is solely at the discretion of the Company and may be changed or eliminated at any time")). That Plaintiffs received significant bonuses in prior years and understood from Wechsler that they would continue, even if true, is an insufficient basis for an implied contract claim.[6]

---

[6]     The Court pauses to underscore that the Handbook's disclaimer that it does not constitute a contract is immaterial to the analysis.  As noted in the text, "the non-contractual nature of a handbook does not render inapplicable an employer's policy of giving bonuses on a discretionary basis in determining whether it is feasible that an implicit course of conduct of nondiscretionary, nonforfeitable bonus allotment existed."

Plaintiffs' separate argument that they were entitled to interpret the continued bonuses from 2016-2019 as an implied contract because they did not receive the Handbook until 2019 similarly falters.  (*See* Pl. Opp. 13-15). Indeed, a nearly-identical fact pattern arose in *Cancro* v. *Agricole Indosuez Severance Pay Program*, No. 05 Civ. 2023 (RJS), 2009 WL 8573475 (S.D.N.Y. Apr. 15, 2009), and Judge Sullivan found, as the Court does here, that the fact of a delay in receipt of the handbook mattered little when the policy was in place for the years at issue (here, 2020).

In *Cancro*, years after plaintiff began his employment, his employer distributed an employee handbook stating that performance bonuses were discretionary, would be determined by management, and would only be distributed to employees working at the bank on the date of bonus payment. 2009 WL 8573475, at *2.  The plaintiff received bonuses in three consecutive years, but then received no bonus in the fourth.  *Id.* at *3.  The plaintiff alleged that his supervising bank executive had "explicitly promised him that his bonuses would not be diminished as long as his level of responsibility and work effort" continued, and that a different bank executive had assured him that the discretionary bonus language in the handbook was false and merely "lip

---

*Ferrand* v. *Credit Lyonnais*, No. 02 Civ. 5191 (VM), 2003 WL 22251313, at *13 (S.D.N.Y. Sept. 30, 2003), *aff'd,* 110 F. App'x 160 (2d Cir. 2004) (summary order).  "It is well established that an employee cannot recover for an employer's failure to pay a bonus under a plan that provides the employer with absolute discretion in deciding whether to pay the bonus." *O'Grady* v. *BlueCrest Cap. Mgmt. LLP*, 111 F. Supp. 3d 494, 501 (S.D.N.Y. 2015) (quoting *Smith* v. *Railworks Corp.*, No. 10 Civ. 3980 (NRB), 2011 WL 2016293, at *3 (S.D.N.Y. May 17, 2011) (citing, *e.g., Namad* v. *Salomon Inc.*, 74 N.Y.2d 751, 752 (1989); *Bessemer Trust Co., N.A.* v. *Branin*, 618 F.3d 76, 92 (2d Cir. 2010))), *aff'd*, 646 F. App'x 2 (2d Cir. 2016) (summary order).

service." *Id.* at *9.  Even in light of those assurances, the court granted the defendant's motion for summary judgment, emphasizing the explicit nature of the handbook's language.  *Id.*  The court went on to state that even setting the handbook's terms aside, the plaintiff's claim for an implied contract would fail for unreasonableness, given the fact that the supervising executive who assured continued bonuses was himself able to make bonus *recommendations*, but had no ultimate bonus-granting power.  *Id.* ("When I was general counsel I would recommend a bonus amount per employee.  And this was then submitted to management in the U.S. and may have been submitted to management at the head office.").

The facts in *Cancro* map onto this case quite cleanly and, for Plaintiffs, unfavorably.  As in *Cancro*, Plaintiffs here came to expect annual bonuses based largely on their repeated receipt of those bonuses.  (*See, e.g.,* Pl. Opp. 5-6, 11-12).  And also as in *Cancro*, a core piece of Plaintiffs' claim here is that they were assured bonuses by the executive in charge of their team at Bancorp, an executive who retained no bonus-granting power himself, but merely recommended bonus distributions to higher-level management officials.  (*See, e.g.*, Def. 56.1 (Kamai) 56.1 ¶ 35; Def. 56.1 (Barker) 56.1 ¶ 35).[7]

---

[7]     The *Cancro* court's focus on the reasonableness of the plaintiff's expectation is also of no help to Plaintiffs here, as it is undisputed that, in this case, (i) the Handbook explicitly and clearly stated that incentive compensation was discretionary (see Handbook § 4.14); (ii) Barker and Kamai acknowledged reviewing the Handbook (Barker Acknowledgment; Kamai Acknowledgment); and (iii) Barker and Kamai understood that the individual guaranteeing them future bonuses had no authority to do so (Def. 56.1 (Kamai) 56.1 ¶ 35; Def. 56.1 (Barker) 56.1 ¶ 35).

The position Plaintiffs ask the Court to take is an extreme and somewhat paradoxical one, as it would effectively tell employers that if they want to maintain discretion in their bonus practices and avoid unwittingly binding themselves to implied contracts, they must refrain from awarding bonuses in consecutive years. For this reason, and for those stated above, the Court finds that "[a]ny expectation of a guaranteed level of bonus compensation, especially in the face of contrary [and well-understood] facts, would be patently unreasonable." *Cancro*, 2009 WL 8573475, at *9.

Plaintiffs' arguments repeatedly return to their shared view that they worked hard in 2020, they worked well in 2020, they made Bancorp money in 2020, and they are thus rightfully owed bonus compensation for 2020. (*See, e.g.,* Pl. Opp. 3, 5, 11-12). The Court is in no position to dispute the veracity of their assessments of their contributions to the bank. But Bancorp failing to acknowledge adequately those contributions does not, in this case, equate to a violation of New York contract law.[8]

---

[8]     Plaintiffs cite to *Harden* v. *Warner Amex Cable Commc'ns Inc.*, 642 F. Supp. 1080, 1096 (S.D.N.Y. 1986), for the proposition that an employer cannot claim a bonus to be discretionary when it is an integral part of a compensation package. (Pl. Opp. 8). But *Harden* is plainly inapposite. There, Judge Leisure found that the plaintiff was entitled to an accrued bonus because "[a]n enforceable agreement existed based upon the offer and acceptance of the yearly bonus payment as part of the plaintiff's compensation package," and such agreement "clearly defined compensation in terms of base salary and bonus," each of which was to increase in future years. *Id.* at 1096. Here, Plaintiffs' offers of employment made clear not only that bonuses were discretionary, but also that any bonus was for the 2015 year only, making no promises about any future years. *Compare id.* at 1083 ("Compensation — Base salary: $125,000 on an annualized basis for 1981 ... plus an expected annual bonus of $65,000 for 1981 payable in early 1982. It is assumed that base and bonus will increase in future years, dependent upon both your own performance and the company's performance"), *with* Barker Offer Letter 1 ("SALARY: $250,000.00/Annually" and "Eligible for discretionary bonus at the discretion and approval of [Defendant] for calendar year 2015, payable in early 2016"); Kamai Offer Letter 1 ("SALARY: $85,000/Annually" and "Eligible for discretionary

**CONCLUSION**

For the foregoing reasons, Defendant's combined motion for summary judgment is GRANTED.  The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close these two cases.

SO ORDERED.

Dated:      September 8, 2023
            New York, New York

_____
            KATHERINE POLK FAILLA
            United States District Judge

---

bonus at the discretion and approval of the company for calendar year 2015, payable in early 2016").